## LAING v. CUNNINGHAM et al.

1. **Husband and wife:** EARNINGS. The earnings of the wife during cover-
ture belong to the husband, and are subject to the payment of his debts.

2. **Homestead:** FOREIGN DEBTS. A homestead is subject to the payment of
debts created prior to its acquisition; and no distinction obtains between
domestic and foreign debts.

*Appeal from Wapello District Court.*

MONDAY, DECEMBER 12.

CREDITOR'S BILL. The plaintiff is a judgment creditor
of the defendant, Henry Cunningham, husband of his co-

defendant, Ann. Cunningham. Execution was returned *nulla bona.* The petition seeks to subject a house and lot in Ottumwa, in the name of Ann, to the payment of the plaintiff's judgment. Issues were joined and a large mass of testimony taken on the question of the alleged fraud. Decree in favor of defendants, and plaintiff appeals.

*A. W. Gaston and Knapp & Wright* for the plaintiff.

*Hendershott & Burton* for the defendants.

DILLON, J.— I. The house and lot which the plaintiff seeks to subject to his judgment, stand in the name of the wife. The plaintiff claims that her title is fraudulent as to him. This the defendants deny. It would require many pages to analyze and review the testimony at length. From a careful and united examination of it, we are satisfied that it fully sustains the plaintiff's petition. The testimony of the witness Clarke, who is entirely disinterested, must overcome that of the defendants. It, corroborated by other testimony, satisfactorily shows that in August, September and the first part of October, 1857, the defendant, Henry, kept a grocery store in Niagara Falls, N. Y. His debt to the plaintiff was created for goods purchased for this store. Soon after contracting this debt, and before all of the goods had been taken to his store, the defendant, Henry, early in October, 1857, caused these goods to be secretly removed, in the *night time*, to the Canada side, where the defendants remained two or three days, sold the goods, or a large part of them, and started west. Before leaving for the west, Henry declared to the witness Clarke at he was satisfied with what means and money he had; showed him some gold; stated that he was going to some western State, and should again go into the grocery business, if he could find some stirring place; was glad to

escape, and was satisfied with his success in getting across to Canada, &c., &c.

On the 27th day of October of the same year, the defendants, having just before reached Ottumwa, purchased the house and lot in question, taking the title in the name of the wife. The purchase-money was $800.00, of which $200.00 were paid down in gold, and the balance in installments. A grocery store was opened in the house, the business being carried on, it may be admitted, in the name of the wife; and from this store the balance of the purchase-money was mainly paid. Improvements have been made on the house and lot to the value of from $500.00 to $800.00, paid for principally out of the store.

The main contest is this: The plaintiff claims that the house was bought with the proceeds of the goods with which the defendant ran away, or other money or means of the husband: the defendant, Ann, claims and in her testimony swears that the $200.00 paid down on the lot, was money of her own, which she earned before her marriage. This is a question of fact, depending upon the testimony. It is most apparent, from the evidence, that the object of the defendant, Henry, with which his wife must have been acquainted, if indeed she did not participate in it, in fleeing from New York, and in disposing of his property in the way above mentioned, was to injure and defraud the plaintiff, his principal creditor.

The purchase of the house *in the wife's name*, instead of his own, was dictated by the same motives. It was thus taken, as we are satisfied, solely to put and keep it beyond the reach of the plaintiff.

It was a fraudulent device. Under the circumstances, the theory and claim of the wife that she purchased the property in good faith, and paid for it with money of her own, is not satisfactorily sustained, and we think the weight of the proof is with the plaintiff.

II. It is next claimed that goods and groceries which finished paying for the house, were the wife's; that her 1. Husband labor is her own, and that her earnings, or and wife: earnings. property in which such earnings are invested, cannot be reached by the creditors of the husband. This view is directly in the teeth of *Duncan* v. *Roselle et ux.*, 15 Iowa, 501. And see *Jones* v. *Crosthwaite, ante*, where the rights of married women, under the law of this State, is considered at some length. We have there taken the liberty to recommend a guarded legislative modification of the common law rule. The circumstances of this case show that great frauds might be practiced if business, really the husband's, could be carried on in the wife's name, his earnings being appropriated to the support of the family, while hers, invested in property, should be exempt from his debts. And yet the law should perhaps do, what it has never yet done in this State, make provision whereby the earnings and labor of the wife should, with proper safeguards against frauds, be placed beyond the reach of idle, intemperate and improvident husbands or their creditors.

III. It is next insisted by the defendant that the premises are exempt as their *homestead*. It is a sufficient answer to 2. Home- this position, to refer to the conceded fact that the stead: for- eign debts. plaintiff's debt was created *prior* to purchase of the property by the defendants. But it is argued by the defendant's counsel, "that the date of filing a claim in our courts by a *non-resident* creditor, must be regarded as the date of the creation of the debt, and that if the homestead of the debtor was acquired before the filing, then it cannot be taken." This position finds no warrant in the law. The legislature has never made any such discrimination between resident and non-resident creditors. And courts will be most reluctant, by construction, to establish a distinction characterized at once by injustice and impolicy. Laws based upon this principle would manifestly tend to

ruin the credit and reputation of the State abroad, and lead other States into retaliatory legislation; would make Iowa a sanctuary for fraudulent and fugitive debtors, with all of the evils and injustice which attended the sanctuaries of the middle ages, without any of the reasons which occasioned and partially justified their establishment, and without the benefits which, in some instances, flowed from them. The decree below is reversed, and a decree will be entered in this court for the plaintiff in accordance with the prayer of his petition.